[Sac. No. 6000. In Bank. Jan. 26, 1951.]

PAUL RICHTER, Appellant, v. DONALD WALKER et al., Respondents.

636

Curtiss E. Wetter and Rawlins Coffman for Appellant.

Alfred E. Frazier for Respondents.

SCHAUER, J.—Plaintiff sued to foreclose a claimed mechanic's lien for $3,187.22, with interest, for labor performed and materials furnished assertedly under an oral

contract to drill a water well on the land of defendants Donald Walker and Ona Walker. These defendants joined issue denying that plaintiff had performed his contract, and cross-complained for damages for breach of contract. The trial court determined that plaintiff had not performed the contract, that such work as was done had not been done in a good or workmanlike manner, and disallowed the lien; it did, however, allow plaintiff the sales price of a pump and motor sold to defendants ($1,350.50), deducting therefrom $653 which defendants had expended in an attempt to improve the well. Plaintiff, who appeals, contends that the evidence does not support the findings nor the findings the judgment. We have concluded that there is ample evidence to support the findings and that the findings, liberally construed, sustain the judgment.

Plaintiff alleges in his complaint that in March, 1947, he and defendants entered into an oral contract for the drilling of a well and the installing of a pump on defendants' property in Tehama County; that he commenced work and first furnished material in connection therewith on the same day; and that he completed the work on June 27, 1947.

Defendants in their answer allege that in October, 1945, they entered into an oral contract with plaintiff whereby he agreed to drill a well on the premises to a depth of 200 feet, if necessary, and "that such well would produce Six Hundred (600) gallons of water per minute"; it was further understood and agreed that defendants would seek to procure a government loan for the financing of the well. Defendants admit that plaintiff entered upon drilling operations on March 15, 1947, but allege that he failed to complete the well in accordance with specifications or in a workmanlike manner, and that, as a proximate result of the carelessness, inefficiency and negligence of plaintiff the well, as left by plaintiff, produced no more than 150 gallons a minute; that the pump installed by plaintiff was not the proper pump for the kind of well produced and was inefficient and too expensive for economical operation; that plaintiff was "fully informed and advised and knew that the defendants were engaged in dairy business and other farming operations," were contemplating extensive leveling work and were in need of the water in the quantity contracted for; that the well as constructed by plaintiff was "of absolutely no value whatever to the defendants and for the defendants to continue their farming operations, they will have to drill an entirely

new well.'' Defendants then cross-complained, seeking damages of $12,653 for plaintiff's alleged breach of contract.

The trial court's findings, although not as specific or certain as could be desired, do determine that plaintiff agreed, in October, 1945, to drill the well at a cost of $5.00 a foot, furnish the casing therefor, and supply a proper pump and motor; such findings also determine that ''it was further agreed that said well would be drilled to a depth of two hundred feet if necessary to provide adequate water for the purposes of said Donald Walker [defendant] and that Paul Richter [plaintiff] would drill said well in a good and workmanlike manner and that said Paul Richter guaranteed the quality of his workmanship. . . . [T]hat said Paul Richter commenced work . . . pursuant to said oral contract on or about March 15, 1947, and thereafter drilled a hole in the premises of said Donald Walker and inserted certain casing therein, and thereafter . . . about March 22, 1947, completed all of his work concerning the said premises of Donald Walker; . . . supplied to the said Donald Walker and Ona Walker a certain Fairbanks-Morse pump and motor at an agreed price of $1350.50, and that the said sale of said pump and motor at said price was separate and distinct from the contract for the drilling of the said well . . . That it is true that the said Paul Richter did not drill said well in a good or workmanlike manner, and . . . said well was and is defective; . . . Paul Richter, was fully informed and advised concerning the requirements of volume of water from said well to make said well economic and practicable and the amount of water so required was between four hundred fifty and five hundred gallons per minute; . . . that if said well had been drilled in a good and workmanlike manner, it might have produced the volume of water required; . . . that said well as drilled . . . failed to produce more than one hundred fifty gallons per minute, and it is true that such failure is partly due to the bad and unworkmanlike manner of drilling performed by the said Paul Richter; . . . that as produced by the said Paul Richter, the well is of slight or very little value to the defendants . . . and is of only slight value to the said premises . . . and does not constitute any improvement whatever to said premises.

''That it is true that immediately after the said Paul Richter ceased drilling operations at said well, he was informed by the cross-plaintiffs of the defective condition of said well and was given ample opportunity to improve said well and

correct any errors made, but . . . thereupon failed and refused to do anything further concerning said well; . . . that after the repeated refusal of the said Paul Richter to improve said well or to make any effort to improve said well, the cross-plaintiffs . . . undertook to make improvements and expended the sum of Six Hundred Fifty-three Dollars . . . therefor. . . . [I]t is true that said well is valueless to any portion of the said premises.

". . . [T]hat defendants . . . are indebted to the plaintiff . . . in the sum of . . . $1350.50 . . . purchase price for said . . . pump; that . . . cross-defendant, Paul Richter, is indebted to the defendants and cross-plaintiffs . . . in the sum of . . . $653.00 . . . expended . . . to improve the said well.

"Except as otherwise specifically found, none of the allegations of the plaintiff's complaint are true, and all of the allegations and denials of the . . . Answer and Cross-complaint as amended are true."

Upon the findings the court concluded that plaintiff was not entitled to a lien but was entitled to recover $697.50 with costs, and judgment was rendered accordingly. Plaintiff's main contentions are that there is not substantial evidence to support certain of the material findings, hereinafter particularly identified, and that the findings do not sustain the judgment rendered.

■ As to the principles governing appellate courts in considering the adequacy of findings to dispose of issues and support a judgment it is a general rule that "Even though a finding might have been more clearly phrased, it is sufficient if its language is clear enough to indicate what the court intended; and if there are findings sufficient to support the judgment, they are not vitiated by the unintelligibility of others. ■ Any uncertainty in the findings will be construed so as to support the judgment rather than to defeat it." (24 Cal.Jur. 965, § 201.) ■ Even where findings are to some extent inconsistent a judgment may not be set aside unless the conflict is clear and material and the findings are incapable of being harmoniously construed. (See 24 Cal.Jur. 967, § 202, and cases there cited; see also 10 Cal.Jur. 10-Yr.Supp. [1947 Rev.] 712, § 202, and cases cited.) ■ Furthermore, general findings that all the allegations or denials of a pleading are true except those as to which the court makes a specific finding, are upheld if by reference to the pleading the import of the finding is reasonably certain. (See 24 Cal.Jur. 987,

988, § 214, and cases cited; see also cases cited in 10 Cal.Jur. 10-Yr.Supp. [1947 Rev.] 717, 718.) It is also to be noted that while full findings are required upon all material issues a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made. (See 24 Cal.Jur. 974, § 207, and cases cited.) And, of course, as to the sufficiency of evidence to support findings, it is the time honored rule that all substantial conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the findings if possible. (*Crawford* v. *Southern Pac. Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183]; *Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689]; see also *Powell* v. *Pacific Electric Ry. Co.* (1950), 35 Cal.2d 40, 41 [216 P.2d 448].)

Specifically, plaintiff contends that the evidence does not support the finding that he did not drill the well in a good and workmanlike manner; his position is that the failure of the well was not due to his activity or lack of activity but rather to the lack of water in the ground. Treating first the necessarily implied finding that there was ample water underground, the record shows the following: Mr. Halle, an engineer with the Farmers Home Administration whose job it is to approve expenditures of government loan funds for various water facilities projects and who had inspected the Walker property and well, testified that in his opinion, based on inspection of wells in the surrounding community and his experience, if a well were properly drilled at the point where plaintiff drilled the well "he should get a well there that would deliver around between four hundred and five hundred gallons a minute at a lift not to exceed ninety feet"; and that he, the witness, would be willing to recommend to the government and to defendants the drilling of another well to obtain the water desired. There is other and detailed testimony in the record concerning the wells in the area and while, as remarked by the judge, "there are wells and wells," nevertheless wells in the area producing water from about the same depth are a strong indication of its presence throughout the immediately surrounding area. Furthermore, plaintiff's employe, the driller of the well, remarked to a government clerk that "if the well had been drilled properly and had been taken care of afterwards properly . . . Mr. Walker would have had all the water he

needed.'' The evidence which has been set forth is ample to support the finding, necessarily implied from the express findings above quoted, that there was sufficient water underground at the point of drilling to make a properly drilled and completed well produce water sufficient to supply defendants' needs.

As to the finding that the plaintiff did not drill the well in a good and workmanlike manner, the record shows the following: Plaintiff commenced drilling on March 15, 1947; on March 22, when the depth of 173 feet was reached the drilling was stopped because, according to the defendant Walker's testimony, the plaintiff and his driller represented to him that ''there was enough water [at this depth] and that he should quit drilling.'' The pump which was to be installed in the well had not arrived so plaintiff ''sealed and capped'' the well and did nothing further until June 24 when the pump was received and installed. As found by the court the maximum amount of water per minute which the well would produce was only 150 gallons instead of the 450 to 500 gallons needed by defendants and required ''to make said well economic and practicable.''

Mr. Halle, the government civil engineer, testified that an essential part of a good and workmanlike job of drilling a well is the practice of ''developing the well.'' ''Developing a well means to remove fine materials . . . like clay or fine sand, which are found in water bearing strata, to remove those to the point where a larger area will deliver water to the perforations in your casing . . . *the usual practice is to within a few days to bring in a pump and pump the well,* develop the well, clean the well out by pumping . . .'' (Italics added.) Others testified to similar ''standard'' practices in the drilling of wells.

Mr. Halle further stated that to permit ''a well to stand for a considerable period of time, say up to three months after drilling and before pumping,'' as was done here, is dangerous in that the fine materials which are allowed to remain become ''very dense and because of their density obstruct the flow of water.'' Halle did not believe plaintiff had ''done a good job out there . . . [Plaintiff] didn't clean the well out'' after finishing drilling and ''didn't put a test pump on . . . [to] determine what the characteristics of the well was, so that a proper pump and motor could be put in there to operate it to the maximum efficiency.''

Driller Ackley, plaintiff's employe, testified that the defendants' well in the present case was not pumped immediately after drilling; it was not pumped until more than three months later, i. e., June 24, when the pump which the parties had agreed to install in the well for permanent use arrived. Plaintiff Richter's explanation for his failure to have the well "developed" immediately after drilling and for not using a test pump to determine the characteristics of the well was that not only was it beyond the scope of the contract but that defendant Walker, when he had an opportunity to order the use of a test pump, refused to expend an additional $140 to secure one. However, the findings of fact do not support plaintiff in this explanation. ■ The court impliedly found that a good and workmanlike performance of the contract by plaintiff should have included developing of the well. Plaintiff did warrant that he would do a good and workmanlike job, and from the evidence related above the trier of fact could well determine that proper procedure, as part of the job of drilling a well, called for pumping to "develop" the well without delay, and also testing to determine the characteristics of the well. ■ This being true, the defendant was under no obligation to advance an additional $140 to induce plaintiff to do what he was already obligated to do.

Plaintiff seeks to fortify his position that the evidence does not warrant the finding that he did not do a workmanlike job by pointing to certain statements contained in a written "opinion" of the trial court. That opinion, however, assuming but not suggesting that it might otherwise have significance, was rendered ineffective by the fact that the court reconsidered the matter upon additional evidence, prepared a subsequent opinion, and thereafter rendered its findings and conclusions. ■ The formal findings and conclusions constitute the court's decision and are controlling. (Strudthoff v. Yates (1946), 28 Cal.2d 602, 615 [170 P.2d 873]; Peebler v. Olds (1945), 71 Cal.App.2d 382, 389 [162 P.2d 953]; Stone v. Los Angeles County Flood Control Dist. (1947), 81 Cal.App.2d 902, 907 [185 P.2d 396].)

Plaintiff also challenges the subject finding by pointing to his own testimony that he did a good job and to testimony of certain other witnesses, both of plaintiff and defendants, to the effect that at various times these persons stated, "it looked like the finest well in the country to me," "I thought he had a good well," etc. ■ It is clear, however, that

such testimony merely creates a conflict in the evidence. Under those circumstances, as previously pointed out, a finding will not be overthrown on appeal.

■ Plaintiff further contends that the finding that when drilling had ceased defendants asked plaintiff to correct the condition and gave him plenty of time to improve the well, and that plaintiff refused, is not supported by the evidence. However, plaintiff himself testified: "He [Walker] told me [Richter] that that was not enough water . . . Q. He asked you to try to correct it several times, didn't he? A. Yes, he did, but I also asked him for the amount of money due me." Plaintiff now contends that the finding was not correct in that it states that the requests were made "when drilling was ceased," when actually the request was not made until after the pump had been installed. According to defendant, he did question plaintiff about the testing and pumping of the well immediately after drilling. In any event, such a narrow construction of the language used, as that now urged by plaintiff, does not appear to be reasonable or to have been contemplated by the parties. As to the layman defendants it is hardly to be thought that a mere viewing of the capped well would have revealed its defects; they could only judge by the results after a pump—temporary or permanent—was installed; the phrase "when drilling was ceased" must be construed to include that time.

■ There is a conflict in the evidence as to the terms of the contract with regard to the supplying and installing of the pump. Defendants' position is that plaintiff was to supply a "proper pump" for the well produced; plaintiff's position is that the contract expressly called for the installation of a 15 horse power pump, to cost $1,350.50. The trial court found that plaintiff agreed "to supply a proper pump and motor complete . . . at an agreed price of $1,350.50." The pump supplied was, because of the low capacity of the well, much too powerful; it was, as plaintiff points out, not necessarily a "proper pump" for this well. While this may be true, the finding may nevertheless stand, for the terms of the contract did contemplate a well producing at least 450 gallons a minute and, for the well anticipated, the pump was "proper." Plaintiff, in any case, should not be allowed to complain of this discrepancy for he was awarded the full price of the pump. There is evidence in the record to sustain defendants' version of the contract, and there is also evidence, as stated previously, that the drilling of a well, and the instal-

lation of a pump, in a workmanlike manner, necessarily involves the installation of a proper pump; i. e., one that conforms to the characteristics of the well. Under this view of the case, plaintiff would not have been entitled to even the cost of the pump, which he was awarded.

Plaintiff further contends that the findings are vague, conflicting, argumentative and cannot sustain the judgment. As noted earlier, the trial court found that "if said well had been drilled in a good and workmanlike manner, it *might* *have* produced the volume of water required," that its failure to produce was "*partly due* to the bad and unworkmanlike manner of drilling performed," and that said well is of "slight or very little value to the defendants," "is of *only slight* value to the said premises," and "does not constitute *any* *improvement whatever* to said premises." (Italics added.) It must be agreed that the findings do appear somewhat equivocal. However, the court did find squarely that plaintiff had agreed to drill to a depth of 200 feet "if necessary to provide adequate water for the purposes of said Donald Walker"; that plaintiff "was fully informed and advised concerning the requirements of volume of water . . . and the amount . . . was between four hundred fifty and five hundred gallons per minute; . . . that said well as drilled . . . failed to produce more than one hundred fifty gallons per minute" and that "it was and is defective"; that plaintiff was informed of the defective condition and "given ample opportunity to improve said well . . . but . . . failed and refused to do anything further"; that he had guaranteed good workmanship but that his workmanship was not good; and that "said well is valueless to any portion of the said premises." We are satisfied that, viewed favorably to sustaining the judgment, the equivocal findings cannot be held to so vitiate the unequivocal findings as to make the judgment untenable. It is also to be noted that the general finding that "Except as otherwise . . . specifically found, none of the allegations of the plaintiff's complaint are true, and all of the allegations and denials of the defendants and cross-plaintiffs' Answer and Cross-complaint as amended are true," affords further support for resolving equivocal ambiguities in the findings in favor of defendants.

The claim of lien filed by plaintiff alleges that plaintiff and defendants Donald and Ona Walker entered into an oral contract for the drilling of the well, installation of casing and furnishing of a pump and that the contract "provided

in substance that . . . Richter should provide the necessary equipment and drill said well as deep as may be necessary to obtain an adequate supply of water,'' etc. From what has heretofore been said it appears that the court found (and on the record the findings cannot be challenged successfully) that plaintiff failed to perform his contract, that his work was not done in a workmanlike manner, that the well ''is valueless to any portion'' of the premises, ''does not constitute any improvement whatever'' and that the ''sale of said pump and motor at [an agreed price of $1,350.50] . . . was separate and distinct from the contract for the drilling of the said well.'' Since plaintiff did not perform his contract, since the work done added no value to the premises and was of no value to defendants, and since the sale of the pump and motor was independent of the well drilling contract, it appears that the claim of lien was correctly denied. Furthermore, it is undisputed that at some time since rendition of the judgment, defendants have tendered to plaintiff the full amount adjudged to be due. Such tender would have extinguished a lien if it had been previously allowed. (See *Kaufman* v. *All Persons* (1911), 16 Cal.App. 388, 402 [117 P. 586]; *Bogue* v. *Roeth* (1929), 98 Cal.App. 257, 261 [276 P. 1071]; *Wagner* v. *Shoemaker* (1938), 29 Cal.App.2d 654, 657 [85 P.2d 229]; see also *Sondel* v. *Arnold* (1934), 2 Cal.2d 87, 89 [39 P.2d 793]; 16 Cal.Jur. 323, § 24.)

 In connection with plaintiff's contention that he should have had judgment for the full amount sued for, plaintiff urges that he was entitled to interest thereon from June 27, 1947,[1] the date he asserts he was entitled to ''full payment'' from defendants. As already mentioned, the trial court found that the sale of the pump to defendants was separate and distinct from the contract for the drilling of the well. It is provided in section 1762 of the Civil Code that ''Unless otherwise agreed, delivery of the goods and payment of the price are concurrent conditions; that is to say, the seller must be ready and willing to give possession of the goods to the buyer in exchange for the price and the buyer must be ready and willing to pay the price in exchange for possession of the goods.'' The trial court made no specific finding as to the time plaintiff became entitled to payment for the pump, or that the parties had agreed on the matter;

---

[1] Three days after delivery of the pump.

neither have we discovered nor have defendants pointed to evidence in the record specifically concerning the date payment was to have been made (other than in relation to defendants' contention that no payment whatever would become due until plaintiff installed a "proper pump" in a "good and workmanlike well," a contention on which the trial court found against defendants). It necessarily follows, we think, from the code section quoted and from the express findings which determine the date of installation of the pump, that plaintiff became entitled to payment for it not later than June 27, 1947, and it further follows (in the absence of a showing of the date on which the $653 offset accrued) that he is entitled to interest (see Civ. Code, §§ 3287, 3302) at the legal rate of 7 per cent per annum on the price of the pump ($1,350.50) from that date to the date (September 13, 1948) of the entry of the judgment of the trial court herein. We find no necessity for modifying the findings of fact.

The judgment is modified to provide that plaintiff receive interest at the rate of 7 per cent per annum on the sum of $1,350.50 from June 27, 1947, to September 13, 1948, and as so modified is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.