[Civ. No. 21355. Second Dist., Div. One. Nov. 13, 1956.]

ANTONIO VALENZUELA, Respondent, v. MARIA C. VALENZUELA, as Special Administratrix with General Powers etc., Appellant.

Rosalind Goodrich Bates and Roland S. Bates for Appellant.

David C. Marcus for Respondent.

FOURT, J.—This is an appeal by defendant from a judgment to the effect that the defendant held certain real property in trust for the plaintiff.

A substantial résumé of the facts in the case is as follows: About April 1, 1949, the plaintiff was, and had been for some time prior thereto, living at the Del Rio Hotel on Union Avenue in Los Angeles. On the date mentioned the plaintiff saw that the property in question, which was across the street from the hotel where he lived, was for sale. The buildings upon the premises were unfit for habitation and the property was generally dilapidated. Plaintiff wanted to purchase the property and fix it up and he contacted Michael H. Berry, the owner of the same and inquired how much he wanted for it. The plaintiff, at that time, had $2,200, which was enough to make some necessary repairs, but not enough for the down payment. Plaintiff discussed the purchase of the property with his father, the original defendant, Gilberto Valenzuela, Sr., and the father offered to assist the plaintiff by providing the down payment.

About April 10, 1949, plaintiff went to the home of Mr. Berry, the owner who lived at Springville, California, and negotiated with him for the purchase of the property for a total consideration of $7,250, with a down payment of $2,500. On the next day, April 11, 1949, Mr. Berry came to Los Angeles and accompanied the plaintiff and his father to the bank to place the transaction for the purchase in escrow. The father advanced the money for the down payment and was to be repaid "as much as you can monthly, every month."

While on the way to the bank plaintiff proposed that the title to the property be placed in the name of the father to secure him for the $2,500 he was advancing as the down payment. At the bank there was further discussion regarding the placing of the title in the name of the father and about

the terms of repayment of the money to be loaned. Some of the conversations between Mr. Berry, the father and the plaintiff were in English and some were a mixture of English and Spanish.

The plaintiff testified that he had the utmost confidence and trust in his father and that there was never any misunderstanding or trouble between them about the propery.

Immediately after the purchase of the property the plaintiff started repairing it and making it habitable. He expended about $4,000 in all in fixing up and maintaining the property; this money came in part from his own funds initially, and later from the rents received. During the first few weeks after the purchase the plaintiff was short of cash and sometimes referred casual workmen to his father for payment until he could get to the bank. These latter mentioned payments were small in comparison to the expenditures which the plaintiff had made.

After the plaintiff took possession of the property he made all of the payments to Mr. Berry, paid the taxes and utilities and collected the rents and paid for the major repairs and maintenance. The father collected one payment of rent from one ''hold-over'' tenant before the tenant was aware of to whom he should pay the rent.

The plaintiff repaid his father sums varying from $40 to $60 per month until he had repaid about $1,600 of the $2,500 advanced by the father as the down payment.

The father did not, so far as the record discloses, ever demand an accounting from the plaintiff ''although, the brothers and sisters of the plaintiff did make such a demand.'' About one month after the purchase the father became ill and on May 26, 1949, was admitted to the hospital. He continued in bad health to the date of his death.

On November 28, 1951, the plaintiff filed suit to establish and enforce a trust against the father in reference to the property. An answer was filed on December 11, 1951, which in effect denied that plaintiff had any interest in the property. There was testimony to the effect that the brother Gilberto Valenzuela verified the answer and that the verification was untrue.

On February 9, 1952, the father died, and his daughter, Maria C. Valenzuela, petitioned for appointment as special administratrix of the estate with general powers and was on July 8, 1952, appointed and the court did, on the same day, sign an order substituting Maria C. Valenzuela as the party

defendant in the place of the deceased Gilberto Valenzuela, Sr.

On June 25, 1949, plaintiff's brother, Gilberto Valenzuela, secured from his father, Gilberto Valenzuela, Sr., a power of attorney while the father was in the hospital. The father signed by making his cross. Using this power of attorney, the brother sold his father's grocery store for $2,000. On September 24, 1949, the brother secured from his father a grant deed to certain property, transferring that property from the father to Gilberto. This property was that which the father had helped his son Gilberto to purchase with title being taken in the name of the father.

On or about July 14, 1950, using the power of attorney, the brother Gilberto mortgaged the property in question to the county of Los Angeles for medical care of the father at the General Hospital.

Mr. Berry stated that he had no dealings with the father relative to the transaction; that he looked to the plaintiff for the payments and that the plaintiff had made all of the payments to the date of the trial.

Under the title "Statement of Questions Involved," appellant has set forth various contentions, the first of which is "Can the Court properly allow counsel to instruct, converse and/or threaten an adverse witness on the stand in a foreign language common to both witness and said counsel?" Most of the case was conducted with an interpreter interpreting from Spanish to English and English to Spanish.

Counsel for the appellant has signally failed to call our attention to any page or line in the transcript where any such statement was made or conduct pursued, and a complete reading of the record on our part fails to show a single instance or situation where counsel for the respondent threatened or instructed any adverse witness on the stand or otherwise.

It is true that out of almost six hundred pages of transcript there are four or five instances where the interpreter failed to translate the answer given, or a similar violation took place. Different counsel represented the defendant at the trial of the case and that attorney apparently was fairly familiar with the language in question, for he said, during the proceedings, "I think I understand Spanish pretty well myself." Furthermore, the record discloses that no objections were made at the time of trial, and it is difficult to see how appellant was in any wise prejudiced thereby.

Appellant's next contention is "Had the Court indicated he had prejudged the case by his language to a witness?"

Our reading of the transcript convinces us that the trial judge said nothing and did nothing which would demonstrate that he had in any wise prejudged the case.

Appellant's next contention is "Did the Court commit error in allowing witnesses to answer in a foreign language without translation?"

In this connection the appellant has cited two instances where the transcript contains words in the Spanish language which were not translated. The first contained the Spanish word "claro." Immediately thereafter the court rephrased the question and an answer was given which was translated. The second is taken out of context. Counsel for the plaintiff had made an objection to a question as calling for hearsay, and while the objection was pending before the court, the question was reasked and the witness replied "Nada mas." Before the interpreter could translate the court interrupted and indicated that he wanted a matter cleared before acting upon the objection. Shortly thereafter, the witness replied "Yes."

Appellant's last contention is "Was there substantial evidence to justify the decision on the uncorroborated testimony of plaintiff only?"

It is our opinion that there was substantial evidence to justify the decision in this particular case.

In *Richter* v. *Walker*, 36 Cal.2d 634, at page 640 [226 P.2d 593], the court said, among other things:

". . . as to the sufficiency of evidence to support findings, it is the time honored rule that all substantial conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the findings if possible. (Citing cases.)"

In *Murphy* v. *Ablow*, 123 Cal.App.2d 853, at pages 858-859 [268 P.2d 80], the court said:

"It is quite apparent, we think, that the findings are adequately supported. We can only consider the evidence most favorable to the findings, together with every inference to be reasonably drawn therefrom. As Mr. Justice McComb stated in *Marson* v. *Rand*, 107 Cal.App.2d 466, 468 [237 P.2d 18]: ' "It is not the province of a reviewing court to present, by way of opinion, a detailed argument on the sufficiency of the evidence to support the judgment where it appears that the question is one purely of determining which side shall be believed. The trial court having determined this with the witnesses before it, the controversy is settled." '

"Questions as to the credibility of plaintiff and the weight

of the evidence were for the trial court. A reviewing court will not hold unsupported the trial court's findings merely because it might reasonably draw different inferences from those the trial court reasonably drew. A reviewing court cannot reject testimony of a witness that has been believed by the trier of the fact unless it is a physical impossibility that it be true, or its falsity is apparent without resorting to inferences or deductions. In order to say that testimony is inherently improbable, it must appear that what was related or described could not have occurred. Testimony which merely discloses unusual circumstances is not inherently improbable. Testimony which is subject to justifiable suspicion does not justify reversal of a judgment. The trier of fact may believe and accept a part of the testimony of a witness, and disbelieve the remainder or have a reasonable doubt as to its effect. On appeal that part which supports the judgment must be accepted, not that part which would defeat, or tend to defeat, the judgment. Unless it clearly appears that upon no hypothesis whatever is there substantial evidence to support a finding of the trier of fact, it cannot be set aside on appeal. (Citing cases.)''

. · In *Trancoso* v. *Trancoso*, 96 Cal.App.2d 797, at pages 798-799 [216 P.2d 172], the court said:

''Maria Trancoso is the mother of all the other parties. . . . The complaint alleged, and the court found and decreed, that the conveyance was in fact in trust and that Maria and Ysidro Trancoso held title for the use and benefit of all the plaintiffs and defendants. . . .

'' . . . . . . . . . . .

''The rule that to establish a particular fact the evidence must be clear and convincing is directed to the trial courts. Whether the evidence is clear and convincing must be determined by the trial court and a reviewing court must accept that determination as conclusive if there is substantial evidence to support it. (Citing cases.)

''We have examined the record and find nothing in the testimony of Maria Trancoso that could not have occurred. There is substantial evidence to support the determination of the trial court.''

In our opinion there was no prejudicial error and there was clear and convincing evidence to support the judgment.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.