[Civ. No. 24905.   Second Dist., Div. Three.   June 30, 1961.]

PATRICK W. McAULIFFE, Respondent, v. CLARA M. FOGLESONG, Appellant.

526

Willedd Andrews for Appellant.

Charles M. Hughes and Ralph St. Sure for Respondent.

BISHOP, J. pro tem.*—It is so futile for an appellant to argue, as the defendant does, that the judgment against her is wrong because it is contrary to the testimony that she gave, entirely overlooking the abundant, positive, contrary evidence of the plaintiff. ▆▆▆ It has been so often said, as we find in *McKinley* v. *Buchanan*, 176 Cal.App.2d 608, 611 [1 Cal.Rptr. 573, 575] : " ' "The appellate courts are required to reiterate from day to day, and with unremitting monotony . . . that the appellate court cannot weigh the evidence to determine where the preponderance lies; that its duty begins and ends with a determination of whether there is any substantial evidence, contradicted or uncontradicted, which supports the findings of fact; and that when two or more inferences reasonably can be deduced from the evidence the reviewing court cannot substitute its own inferences for those of the trial court." In the present case, therefore, it is not proper to attempt a retrial or revaluation of the evidence. The record discloses abundant conflict, but it also reveals substantial evidence in support of the verdict.'

▆▆ "The test is not whether there is a substantial conflict in evidence but whether there is substantial evidence in favor of the respondent."

▆▆ Plaintiff's action, commenced in June of 1958, was based upon a written contract, bearing date of November 29, 1952, in which the defendant agreed to buy plaintiff's White Mine for $50,000, payable: $500 down; $4,500 in 30 days; and the balance during the month of January 1953. Only the initial payment of $500 was paid. Judgment for $49,500,

*Assigned by Chairman of Judicial Council.

together with interest on the $4,500 from its due date and the $45,000 from January 31, 1953, a total of $67,294.24, was awarded the plaintiff, and the defendant appealed.

The defendant admits that she signed the contract to pay defendant $50,000 but insists that the purpose of the writing was to accommodate the plaintiff and not to evidence an agreement. According to her story, the plaintiff had a prospect for the mine for $100,000, but that his son-in-law was trying to get the mine from him (the plaintiff), and so he wanted the protection that a purported contract with the defendant would give him. It was agreed between them that she was not buying the mine, just saving it for the plaintiff.

The $500 was admittedly paid to the plaintiff, but, again according to defendant's version, not as a down payment under the contract, but as a loan to the plaintiff, who had a sick son, on charity, who could be cured if his father could give him $500. The transaction took place in the presence of a witness, who died a year before the trial.

The defendant had loaned the plaintiff sums of money before this deal, and held a mortgage on the White Mine to secure some $3,800. In April of 1953—we are still relating defendant's account of events—the plaintiff persuaded her to take a quitclaim deed to the White Mine in full settlement of her claims against him. She did not want to do it; she wanted the money; but she gave in and took it.

The plaintiff's testimony did not run parallel with but counter to that of the defendant. She came to him, he testified, and said: " 'Mr. Mac, will you sell me your mining property for $50,000 cash?' " He agreed to do so. She then said that "Mr. Reade, the mining engineer, was going in with her and would run the mine and lease the property, the Italian Hill to Du Pont people in San Francisco." In a couple of days she came to the plaintiff with the contract prepared for execution and they signed it, and she gave him five one-hundred-dollar bills.

The quitclaim deed was given the defendant at her request, according to plaintiff. She had the plaintiff meet her at his attorney's office, where she reported that Mr. Reade had phoned her and she said: " 'I've got to go to San Francisco most any day now, maybe this week, to sign the contract . . . I'll have to have the deed.' " On her promise not to record it, he gave it to her. On rebuttal, the plaintiff further categorically and emphatically denied defendant's version of events.

With these conflicting statements before him, the trial judge had to determine who was telling the truth and who was definitely not. No doubt he was helped by the many letters written by the defendant, in longhand, to the plaintiff. Selecting parts of just a few of them, we note, to begin with, one airmailed June 22, 1956, in which defendant wrote: "I haven't written because I have waited from day to day to be able to telegraph you that the 'Go' signal had been given. . . . I have at times been almost to the 'quitting' point, . . . Poor Mr. Reade! He has been a brick and not for a second would he give in. Neither would the Eastern men. . . . And believe me I will be grateful to 'Our Father' when I can put your money in your hand." In between that and the first letter of June 9, 1953, were those with references to Mr. Reade and the Du Ponts, most of them expressing confidence that the big day was no more than a week away. In the letter of November 29, 1954, we read: "You can take your full price now or part of it now and the remainder on Jan. 2nd." In a letter airmailed December 6, the defendant wrote: "If we get this money next week, I suggest you take enough to help you and the boys through until Jan. 1st. . . . However, if you want it all at one time I will see that it is paid to you when and as you want it." January 6, 1955, she wrote: "I never realized how complicated it could be, but when millions of dollars are involved, the participants take no chances of anything going wrong. . . . I advise you, at this time, to take all of your money, to be paid in Nevada." In a like vein, she wrote August 9, 1955: "Yes, I think Las Vegas is a good place for you to receive your money, but that is up to you to decide. . . . Mr. Reade told me to tell you that you *will have* your money right away . . . ." The last quotation we will make is from a letter of December 8, 1955: "It has taken a long time . . . . And I will pay you in *full* in CASH."

Even if the trial court *might* have read a meaning into these letters in harmony with the facts as painted by the defendant, they are certainly consistent with plaintiff's theory. He sold his mine to the defendant. She had not paid him, but hoped to through the deals she and Reade were making. She had received a deed, making the deal easier to conclude, but that only served to make defendant's obligation, to pay plaintiff for the mine, greater. The deed definitely did not serve to supplant the contract of purchase. She recognized that he had so much money coming to him that it was a matter of

concern from the income tax point of view. The trial court was fully warranted in concluding that the defendant had entered into the contract to buy plaintiff's mine and that a balance of $49,500 remained unpaid.

■ The trial court was also warranted in interpreting the letters as an unconditional acknowledgment by the defendant of her indebtedness to the plaintiff. As the letters were written before the statute had run upon the obligation their effect was to start a new four-year period running and before it had expired the action was commenced. In an action whose facts parallel those just noted, decided by this court, such an acknowledgment was held to lift the bar of the statute of limitations and start it running anew. The case referred to is *Sterling* v. *Title Ins. & Trust Co.* (1942), 53 Cal.App.2d 736, 739-743 [128 P.2d 31, 34-35], where the principle is so thoroughly discussed and supported by authorities, that we are not undertaking to add anything to it, other than to call attention to *Western Coal & Mining Co.* v. *Jones* (1946), 27 Cal.2d 819, 823 [167 P.2d 719, 721, 164 A.L.R. 685], which cites the Sterling case along with others in support of its conclusion that an acknowledgment in writing, of an indebtedness, serves to stop and start anew, the statute of limitations.

The letters not only unconditionally acknowledged the existing indebtedness, but in that of December 8, 1955, there is an express promise to pay it in full. ■ As is recognized in each of the cases we cite in the preceding paragraph, a new promise serves independently, to stop the running of the statute and to furnish a new starting point. For two reasons, therefore, the defense of the statute of limitations fails.

The interest included in the judgment was authorized by section 3302, Civil Code. (*Richter* v. *Walker* (1951), 36 Cal.2d 634, 646 [226 P.2d 593, 600].) Each amount is figured from the day a sum became due and remained unpaid; it is not calculated as though it ran from the date of the contract.

We see no reason to reverse the judgment. It is affirmed.

Vallée, Acting P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 23, 1961.