[Civ. No. 31343.   Second Dist., Div. Five.   Oct. 22, 1968.]

JOSEPH H. FREEMAN et al., Plaintiffs and Respondents, v. AFFILIATED PROPERTY CRAFTSMEN, LOCAL 44 et al., Defendants and Appellants; JACK SHULTZ et al., Interveners and Appellants.

724

Sidney Sampson and David J. Sachs for Defendants and Appellants and for Interveners and Appellants.

Joseph H. Freeman and Velma B. Freeman, in pro. per., for Plaintiffs and Respondents.

STEPHENS, J.—This is an appeal taken by three of many defendants in a quiet title action decreeing fee title to an undivided interest to be in plaintiffs and declaring that no interest in and to the property involved is had by defendants, or any of them.

For analysis of this appeal, except as may necessarily be included within the general statement of facts, we will discuss only the claims and defenses of plaintiffs Joseph H. and Velma B. Freeman; plaintiffs in intervention Jack and Pearl Shultz; defendants William L. and Celeste M. Hoerber and Affiliated Property Craftsmen Local 44.

On and before February 16, 1900, one Batcheller, as administrator of the John H. Packer estate, was the owner in fee simple and in possession of all of the lands involved in this dispute. On February 16, 1900, in an action entitled *Beverage* v. *Manning,* a judgment of condemnation was recorded, condemning the strip of land 35 feet wide and traversing the whole of the property (approximately 600 feet in length), subsequently to be described as the "A. Gardner West of Hollywood Subdivision." By this condemnation decree, there was condemned an easement for railroad right of way only, the fee title not being condemned. Thereafter, distribution of the property involved from the Packer estate was made to Mary M. Packer (29/30ths) and William C. Packer, Jr. (1/30th) of undivided interests of "The west thirty five (35) acres of the fractional north east quarter (N.E. ¼) of said Section nine (9)." By two deeds, one of March 23, 1901 from Mary M. Packer and one of May 13, 1901

from William C. Packer, Jr. (by guardian), the referred-to 35-acre property was conveyed in fee simple to one Alan Gardner. The Los Angeles Pacific Company received by grant deed on January 15, 1906, that easement theretofore acquired by the condemnor on February 16, 1900, and nothing more.[1] On July 17, 1901, Gardner recorded the map of "A. Gardner's West of Hollywood Subdivision."

On May 28, 1902, Gardner conveyed to one Weisel (predecessor in title to the portion of said property hereinafter referred to as the Shultz property) "Lot Two (2) of A. Gardner's West of Hollywood Subdivision, . . . Excepting a strip six (6) feet wide along the southeast line of said lot as far as a culvert under the railroad track for drainage purposes only." At the time of this conveyance of the Shultz property (Lot 2), the recorded tract map appeared as in Diagram #1. (See *post.*)

On February 11, 1905, Gardner recorded the map of "A. Gardner Tract" (hereinafter referred to as "resubdivision" map, attached *post* as Diagram #2). By the "resubdivision," Gardner altered his subdivision plan of 1901 (at least as far as the property with which we are concerned) from acreage parcels or lots to city lots. Also, he dedicated an alley, with which we are not concerned, and, for street purposes, an area on the easterly edge of a portion of the original subdivision, a 40-foot strip (Vista Street) extending from Sunset Boulevard north to Michigan Avenue (these being existent, dedicated streets). Excluded from the "resubdivision" is that portion of the original subdivision designated as "Lot 2," which had been conveyed to Weisel.

By various transactions shown by deeds of record and a stipulation of fact, it appears that one Larson acquired the property designated as "Lot 2" on the original subdivision map and obtained a quitclaim deed from Gardner in 1924 relative thereto. By this conveyance of 1924, the 6-foot reservation as set forth in the Weisel deed of 1902 was eliminated. Likewise, by stipulation, it is established that the Shultzes "are the record owners of the southerly 202.90 feet of Lot 2 of A. Gardner's West of Hollywood Subdivision, as more particularly described in that certain deed from Alan Gardner

---

[1]Under articles of incorporation and consolidation in 1911, Pacific Electric Railway Company became the successor in interest to the Los Angeles Pacific Company. The easement herein involved will hereinafter be referred to as the Pacific Electric right of way.

and Ada K. Gardner to Peter Weisel, dated May 28, 1902, . . .'' The particular portion of the original subdivision denoted as ''Lot 2,'' which at present is owned by the Shultzes, is that portion shown on Diagram #3 (see *post*) and numbered (A) and (B). The record then may be said to establish that the property owned by the Shultzes is a portion of that ''Lot 2'' conveyed in 1902 to Weisel, but without the drainage ditch reservation.[2] Title in the Shultzes derived from immediate predecessors, one Franklin (Lot A) and one Montgomery (Lot B).

On March 6, 1905, Gardner conveyed Lot 1 in Block 1 as shown in the ''resubdivision'' map (Diagram #2) to one Soethout. ''Lot No. 1'' of the resubdivision map, Block 1, was a triangular lot with a frontage of 242 feet on the south side (Sunset Boulevard). The hypotenuse of ''Lot No. 1'' was parallel to and southeasterly of the southeasterly property line of the Shultz ''Lot 2.'' In 1945, the Hoerbers succeeded to a portion of this interest, the Hoerber ownership covering the westerly 60.92 feet thereof only. The Hoerber lot is designated (C) on Diagram #3. On October 7, 1948, one Dulgarian became the owner of a portion of the Soethout Lot No. 1. This parcel adjoined the Hoerber parcel on the west and extended easterly along Sunset for 50 feet, and is designated (D) on Diagram #3. On June 10, 1954, Affiliated Local 44 acquired the remainder of the Soethout Lot No. 1, and this portion of the Soethout Lot No. 1 is designated (E) on the resubdivision map.[3]

The property in issue is that area of the ''subdivision'' and ''resubdivision'' maps denominated ''Los Angeles Pacific Railway,'' which is adjacent to the properties of Shultz, Hoerber, and Affiliated Local 44. Each of these parties claims an ownership in the railway strip to the center thereof for the length of their properties.

The total area of the disputed ''strip'' is .55 acres. Following Los Angeles Pacific Railway's acquisition of the property, a rail line was built over the 35-foot-wide strip, and an electric railway was operated thereon until some time in 1954. During 1954 the Pacific Electric Railway Company aban-

---

[2] The Shultzes acquired from the heirs of Larsen, by quitclaim deeds, dated 1963, all interests to said property possessed by Larsen.

[3] At time of judgment, Affiliated Local 44 had acquired the Dulgarian parcel, making it the owner of Lots (D) and (E) as marked on Diagram #3.

doned the line by proper authorization, and the rails themselves were removed in March of 1955. Subsequently, Pacific Electric leased portions of the strip to various owners of property abutting portions of the strip. Affiliated Local 44 was not among the lessees, but the Hoerbers and persons prior in title to the Shultzes were.

Pacific Electric did not claim title in fee from the condemnation judgment, but did claim title in fee by adverse possession after 1955. From within a few weeks after the tracks had been removed, Affiliated Local 44 commenced using the adjacent portion of the strip for business parking purposes, with access obtained from Sunset Boulevard and from underneath Affiliated's business structure. No authorization for the continuous parking was obtained, and it was open and notorious, continuing for more than 5 years prior to the filing of this action. Affiliated filed an amended cross-complaint, adding a claim for easement by prescription if the court denied its claim to title in fee by prescription of the whole of said 35-foot strip adjacent to the property of Affiliated. The use of any or all of the strip for parking was not exclusive as to Affiliated, nor was control attempted by them.

No portion of the Pacific Electric right of way was included in the inventory, or specifically described in the estate of Alan Gardner. In the original subdivision map, the strip is designated as ''Los Angeles Pacific Railway,'' and is not shown as a street, road, highway, or alley. In the ''resubdivision'' map, in addition to the above-referred to designation, there is a further inscription: ''Not a Portion of this Tract.'' This notation appears along the northwesterly edge of the strip and adjacent to the southeasterly portion of ''Lot 2'' as shown on the original subdivision map.

The Freemans acquired the title they claim to the strip by various deeds from successors in interest of the estate of Alan Gardner. The Freemans contend that title to the strip passed from the Gardner estate in the omnibus clause.

The contentions of the Shultzes and Hoerbers differ from those of Affiliated, and will therefore be considered separately.

The first contention by the Shultzes and Hoerbers is that, as adjoining owners of the subject property (strip), they took title to the bordering underlying fee under the presumptions

of Civil Code sections 831 and 1112 and Code of Civil Procedure section 2077, subdivision 4.[4]

By the contention made, the rule applicable to monuments as boundaries is urged as applicable here. The case of *Freeman* v. *Bellegarde*, 108 Cal. 179, 184 [41 P. 289] succinctly states the rule as follows: "In the absence of any qualifying term the designation in a conveyance of any physical obje t or monument as a boundary implies the middle or central point of such boundary; as, for example, if the boundary be a road or highway, or a stream, the thread of the road or stream will be intended; if a rock, a heap of stones, or a tree be the boundary the central point of such tree or rock or heap of stones will be intended. A private grant is to be interpreted in favor of the grantee, and, if the grantor is the owner of the monument or boundary designated in his grant, his conveyance will be held to extend to the middle line or central point of such monument or boundary."

The Shultzes and Hoerbers trace their titles to the original owner and subdivider of the property (Gardner), and there is no question on appeal but that Gardner was the owner of the underlying fee in the subject property, subject only to the Pacific Electric right of way easement. Each of the maps, the original subdivision and the resubdivision maps, showed the existence of the 35-foot wide strip.

As *Freeman* v. *Bellegarde, supra,* points out, the monument rule is an aid to construction of the intent of the grantor and is not mandatorily applicable in the face of convincing proof of contrary intent. Some oral testimony was taken as it related to acts of Pacific and of present day land owners respecting the area, none of which related to the intent at the time of conveyance by Gardner. It is the time of conveyance which must be looked to to establish the intent.

In *Neff* v. *Ernst,* 48 Cal.2d 628, 635 [311 P.2d 849], it is stated: "The transfer of land, bounded by a highway, passes the title of the person whose estate is transferred to the soil of

---

[4]Section 831. "An owner of land bounded by a road or street is presumed to own to the center of the way; but the contrary may be shown."

Section 1112. "A transfer of land, bounded by a highway, passes the title of the person whose estate is transferred to the soil of the highway in front to the center thereof, unless a different intent appears from the grant."

It might be added that Code of Civil Procedure section 2077, subdivision 4, which sets forth the same rule, applies it also to a "stream of water not navigable."

the highway in front to the center thereof, unless a different intent appears from the grant. (Civ. Code, § 1112; *Moody* v. *Palmer,* 50 Cal. 31.) In case of doubt, the deed must be construed in favor of the grantee. (Civ. Code, § 1069.) It is the general rule that it will be presumed that where property is sold by reference to a recorded map the grantee takes to the center of the street or streets shown on the map as bounding the property, even though the streets shown therein appear to have been vacated or abandoned or the deed itself refers to the streets as having been vacated or abandoned. The presumption continues to apply in the absence of a clear expression in the deed not to convey title to the center line. (*Anderson* v. *Citizens Sav. etc. Co.,* 185 Cal. 386 [197 P. 113]; *Pinsky* v. *Sloat,* 130 Cal.App.2d 579 [279 P.2d 584].)''

It is well established that the same rule may apply to a railroad right of way. 4 Tiffany, Law of Real Property (3d ed.) p. 113 states: ''Where an owner conveys a tract abutting on a railroad right of way in which he owns the servient estate, the trend of authority seems to be to hold that the conveyance passes the servient estate, unless a contrary intention is indicated.'' [Citing *Roxana Petroleum Corp.* v. *Sutter,* 28 F.2d 159; *Roxana Petroleum Corp.* v. *Jarvis,* 127 Kan. 365 [373 P. 661]; *Cuneo* v. *Champlin Refining Co.,* 178 Okla. 198 [62 P.2d 82]; *Gulf Production Co.* v. *State* (Tex. Civ. App.) 231 S.W. 124; *Rio Bravo Oil Co.* v. *Weed,* 121 Tex. 427 [50 S.W.2d 1080, 85 A.L.R. 391].] The 1967 Cumulative Supplement (p. 98) cites additional cases: *Eureka Real Estate etc. Co.* v. *Southern Real Estate & Financial Co.,* 355 Mo. 1199 [200 S.W.2d 328]; *New Orleans & Northeastern R.R.* v. *Morrison,* 203 Miss. 791 [35 So.2d 68]; *Putnam* v. *Oklahoma City,* 203 Okla. 570 [224 P.2d 270]; *Hill* v. *Cunningham* (Okla.) 329 P.2d 1034; *Fleck* v. *Universal-Cyclops Steel Corp.,* 397 Pa. 648 [156 A.2d 832]; *Standard Oil Co.* v. *Milner,* 275 Ala. 104 [152 So.2d 431] citing Tiffany. In *Faus* v. *Nelson,* 241 Cal.App.2d 320, 324 [50 Cal.Rptr. 483], the court stated that every common law jurisdiction except Maine and England has applied the rule pertaining to highways to railroad easements, and cited for a collection of cases 85 A.L.R. 404. Ogden's California Real Property Law (1956) (pp. 483-484) is to the same effect.

There is interesting language contained in the deed of 1902, which guides us to the proper conclusion of the grantor's intent. The deed reserves an easement, as follows: ''Excepting

a strip six (6) feet wide along the southeast line of said lot as far as a culvert *under the railroad track* for drainage purposes'' (accent added). Had the grantor believed that he was *not* conveying title to the land to the center of the Pacific Electric right of way, certainly he would not have reserved an easement to and including the culvert under the *track* which centered the right of way. As stated in 11 Corpus Juris Secundum, § 45, p. 594: ''It has been held that a 'railroad,' when given as a boundary of a tract of land, will be construed to mean the right of way, and not the steel rails; but land described as bounded by 'the north line of the railroad track' extends to the line of the rails, and not merely to the right of way.'' There is a further indication of that intent by Gardner when in 1924 he quitclaimed ''Lot Two (2),'' The Shultz property, thus clearing the reserved easement of the 6-foot drainage ditch.

The record establishes that the conveyance from Gardner to Weisel was the sole transaction dealing with this tract until after the filing of the resubdivision map in 1905. It was not until January 6, 1906, that the predecessor to Pacific Electric Railway acquired the right of way and made real the easy transportation to and from the tract. The conveyance to Weisel, of course, eliminated that portion of the Gardner tract from resubdivision, and it was necessary to show this on the new tract map. In addition to the smaller lot-type subdivision, new dedications of streets and alleys, and other noted matter, there was inscribed, ''Not a Portion of this Tract,'' along and in the strip area immediately adjacent to the excluded Shultz property (Diagram #2). It is urged that this notation was designed to give notice of an exclusion of the strip from subdivision, and the trial court so construed it.

It is undoubtedly the rule that where there is any evidence either direct or indirect, contradicted or uncontradicted, which supports the trial court finding, it must be sustained on appeal. (*Richter* v. *Walker,* 36 Cal.2d 634 [226 P.2d 593]; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689].) This rule is subject to the well recognized exception applicable where all the evidence is documentary and no extrinsic evidence has been admitted to aid in construction or inference. As stated in Witkin, California Procedure (1967) Supp., § 89A, pp. 942, 943: ''In *Parsons* v. *Bristol Dev. Co.* (1965) 62 C.2d 861, 44 C.R. 767, 402 P.2d 839, the issue was whether defendant's liability for payments under a contract was sub-

ject to a condition precedent—an event which had not yet occurred. Extrinsic evidence was admitted, and the trial judge denied recovery. The Supreme Court affirmed, and, since it reached the same conclusion as the trial judge there was no need to consider the differing views. But the court felt that it was time to resolve the conflict and it did so as follows:

"*First*, as to Rule (b), text, § 89: The extreme cases suggesting that the trial judge's interpretation must be accepted if it is reasonable (e.g., *Lundin* v. *Hallmark Productions,* supra, *Prickett* v. *Royal Ins. Co.,* supra, *Estate of Cuneo,* supra) were explained as holding only that the reviewing court must find the interpretation erroneous in order to reverse; they do not mean that the reviewing court is absolved of its duty to interpret. (62 C.2d 866.)

"*Second*, as to Rule (a), text, § 89: This rule, that where extrinsic evidence is introduced from which conflicting inferences may be drawn the reviewing court must accept the trial judge's reasonable interpretation, was *rejected*, and cases supporting it (e.g., *Estate of Rule,* and *Overton* v. *Vita-Food Corp.,* text, p. 2243) were disapproved. The correct view, the court declared, was that declared in *Estate of Platt* (text, p. 2253), in the dissent in *Estate of Rule* (text, p. 2253), and in *Estate of Shannon, Supp.,* supra, § 89: Where there is no conflict in the extrinsic evidence (and therefore no problem of its credibility, but only of inferences to be drawn therefrom), the reviewing court 'must make an independent determination of the meaning.' (62 C.2d 866.)

"See also, following *Parsons* case, where there is no extrinsic evidence or its credibility is not involved, *Miller* v. *Citizens S. & L. Assn.* (1967) 248 C.A.2d 655, 660, 56 C.R. 844; *Kusmark* v. *Montgomery Ward & Co.* (1967) 249 C.A.2d 585, 587, 57 C.R. 678; *Alec Fergusson Elec. Contractors* v. *Integrated* (1967) 250 C.A.2d 287, 294, 58 C.R. 503; *Kurland* v. *United Pac. Ins. Co.* (1967) 251 C.A.2d 112, 116, 59 C.R. 258."

■ There being no substantial evidence to contravene the presumptions of Civil Code sections 831 and 1112 as related to the Shultz property, title to the property underlying the strip, to the center thereof and adjacent to the lots designated (A) and (B) on Diagram #3, is in the Shultzes.

Does the fact that the Hoerber property was first acquired after the filing of the resubdivision map and that the Hoer-

bers made no claim to the property involved prior to the instant litigation, but to the contrary, were among those adjacent lot owners leasing the said property abutting the lot owned by them,[5] require a different result? The leases thus involved show claim of right to the property by the Pacific Electric Railway Company through adverse possession after the 1955 abandonment of railway use. That the lessees may have mistakenly acquiesced in this belief does not affect the intent of the original grantor, Gardner; nor does it shed any light upon that issue. Thus we conclude that these facts do not alter the intent of the grantor, Gardner.

As we have already noted, we have concluded that there was no substantial evidence before the trial court, excepting the documents and stipulations referred to, as to the issue relative to the Shultz property. Once the original intent by the grantor to convey to the center of the rail line monument is established, it would continue in the absence of a clear indication to the contrary. The question is whether there is a clear indication discernible from the resubdivision map and subsequent conveying deeds. Only the size of parcels within the subdivision and the words "Not a Portion of this Tract" differentiate the two subdivision maps.[6]

In *Shell Petroleum Corporation* v. *Hollow,* 70 F.2d 811 at p. 814,[7] the court expressed the rule, as follows: "It may be said generally that the servient estate passes with a conveyance of the fee to the abutting tract when the instrument is silent with respect to the matter, or if the estate is not excluded in clear, unequivocal, and unmistakable language. Exclusion by clear, unequivocal and unmistakable terms is required, and a reservation is construed more strictly than a grant. The provision in question does not indicate clearly, unequivocally, and unmistakably an intent to exclude the servient estate. Instead, it reflects a purpose to exclude the

---

[5]The record shows that the immediate predecessors in title to the Shultz property likewise leased the questioned property. The Shultzes, however, obtained quitclaim deeds from the heirs of Larson, in furtherance of their claim.

[6]As we have already noted, certain new streets were likewise dedicated in the second map, but this was only to facilitate the lot type subdivision, and does not pertain to the question before us.

[7]The language contained in the deed involved in *Shell* (p. 812) was quite similar to that of the instant case. The tract there described included a school area, and the conveyance contained this provision of exception or exclusion: "Excepting, however, *and not included in this grant,* one acre in the extreme NE corner of the SE¼ which has been deeded to School District No. 29." (Italics added.)

dominant estate then held by the school district. It reflects the desire of a reasonably prudent person to safeguard himself against liability on his warranty for the dominant estate of the school district.''

■ It is contended that where the grantor owns the land on both sides of the railroad easement—hence, after a sale of a parcel, on one side thereof—the grantor retains, as connected to his land, the whole of the land subject to the easement. This rule was applied in *Couch* v. *Texas & Pac. R. Co.*, 99 Tex. 464 [90 S.W. 860, 122 Am.St.Rep. 653, 72 L.R.A. N.S. 1111].

As we have pointed out, the conveyance of the Shultz property was a conveyance to the center of the railroad right of way, and at the time of the sale of the Hoerber property, no longer was there an adjacent piece of property owned by the grantor, Gardner. Therefore, the *Couch* rule of not applying the presumptions as codified in Civil Code sections 831 and 1112 is not applicable here.

In both of the Hoerber and Shultz deeds, reference is made to a lot number of a particular tract. The fact that it appears from the subdivision map that the lines of the lots adjacent to the Pacific Electric right of way stop at the exterior line of such right of way is not of itself sufficient to exclude the conveyance of title to the center of the railroad (11 C.J.S., § 104a, p. 696). ■ The general rule is that where lots are sold by number and not by metes and bounds, reference being made to a registered map and plat which show that the property abuts on a street or highway, the conveyance carries title to the center of the street. (8 Cal.Jur.2d, § 8, 787-8.) We have noted that the same applies to rail line monuments. (*Faus* v. *Nelson, supra,* 241 Cal.App.2d 320, 324.)

■ Both the Shultzes and the Hoerbers have sought affirmatively to quiet title in themselves to the center line of the Pacific Electric right of way. In addition to this affirmative relief by cross-complaint, they answered the quiet title action initially filed by Freeman. So also did Affiliated answer Freeman's action. ■ It is axiomatic that in a quiet title action the plaintiff must prevail on the strength of his own title, and not on the weakness of defendant's title. (*Knoke* v. *Knight*, 206 Cal. 225 [273 P. 786] ; *Sears* v. *Willard*, 165 Cal. 12 [130 P. 869] ; *Mandel* v. *Great Lakes Oil etc. Co.*, 150 Cal.App.2d 621 [310 P.2d 498].)

■ The evidence has been set forth in such manner as to

not only test the strength of Freeman's claim for quiet title, but likewise to establish the affirmative claims in the Shultzes and the Hoerbers. Our conclusion is that the Shultzes and Hoerbers have met that burden, and judgment quieting title in them is ordered.

This leaves only the question as to the affirmative relief sought by Affiliated Local 44.

Affiliated Local 44 claimed title only through adverse possession. By amended pleading, a second right was alleged, conditional upon an adverse finding on the claim of title by adverse possession. The second claim by Affiliated is that an easement by prescription for car parking purposes was acquired through its use of the area. The trial court found adversely to both contentions.

We need not analyze the correctness of the court's finding as to Affiliated's claim under either of these stated theories. In Affiliated's cross-complaint for quiet title, the claim of title and a description of the property are fully set forth. The evidence admitted at the trial traces title in Affiliated through purchasers back to the original sale of the property by Gardner to one Soethout. In the light of the holding as to the Hoerbers and the Shultzes as heretofore stated, Affiliated likewise is possessed of title to the center of the railroad right of way. Under the rule of *Ward* v. *Taggart,* 51 Cal.2d 736, 742 [336 P.2d 534], we find that the same legal theory presented by the Hoerbers and the Shultzes may sustain a judgment for Affiliated, though a different theory was relied upon by Affiliated. This legal theory, though not raised in the trial court by Affiliated, does not raise factual issues not presented there, and the question becomes, under the existing circumstances, one of law only. (*Allstate Ins. Co.* v. *Orlando,* 262 Cal.App. 2d 858, 867 [69 Cal.Rptr. 702].)

The judgment is reversed and the cause is remanded to the trial court for entry of judgment quieting title to the respective parties, the Shultzes, the Hoerbers, and Affiliated, in accordance with the views hereinbefore expressed.

Kaus, P. J., and Aiso, J. pro tem.,* concurred.

A petition for a rehearing was denied November 8, 1968, and respondents' petition for a hearing by the Supreme Court was denied December 18, 1968. Peters, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.

DIAGRAM #1

DIAGRAM #2

738

A GARDNER TRACT

Being a resubdivision of Lots 1,3 & 4 of
A Gardner's West of Hollywood Subdivision
as recorded in Map book 1 Page 20
Los Angeles County, California.
Surveyed Dec. 1904 by R.G. Miller
Scale 100' = 1"
In the City of Los Angeles

Mapbook 6, Page 107

DIAGRAM #3