Filed 5/19/26 P. v. Fjeld CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B347828 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 24AVCF00099) |
| v. | |
| BLYTHE FJELD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu and Scott A. Yang, Judges. Affirmed.

Margaret Manning, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Blythe Fjeld (defendant) appeals from the judgment of conviction by plea, arguing that the trial court abused its discretion in denying her pre-plea motion for mental health diversion (Pen. Code, § 1001.36).[1]  We conclude there was no abuse of discretion and affirm.

### FACTS AND PROCEDURAL BACKGROUND

**A.**    ***The Underlying Offenses*[2]**

On the morning of January 17, 2024, defendant quickly pulled her car alongside her cousin Courtney Adams, who was in the parking lot of the business complex where Adams worked in Lancaster, California.  Adams got out of her car to talk to defendant, as defendant "looked distraught"; defendant proceeded to complain that she "couldn't do this anymore," and warned that "she was going to run [Adams] over."  Defendant ignored Adams's entreaties to turn off her car; instead, defendant backed up the car, turned the car to face Adams, and accelerated the car forward toward Adams at approximately five miles an hour.  Adams stepped out of the way.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Our factual summary is taken from the preliminary hearing transcript.

2

When one of Adams's coworkers approached to try to help calm down defendant, defendant drove off. Adams got back into her car to follow. Defendant drove to a market and, after boxing in Adams's car, accused Adams of abandoning her because Adams had ceased checking in on defendant and bringing her money and food. When Adams responded that she could no longer provide that assistance to defendant, defendant again drove off. Adams once again followed and called 911 because defendant "jerked around" as she drove and was "d[oing] loops around town." Defendant's unsafe driving escalated—she did "some donuts . . . in a little dirt parking lot" and then "ran multiple red lights." At one point, defendant flipped her car around and "directed her vehicle in [Adam's] direction"; Adams had to "immediately swerve" to avoid the collision.[3]

Defendant suffers from schizoaffective disorder, bipolar type, and had stopped taking her prescribed medications by the time of the incident.

---

[3] This characterization of defendant's conduct comes from Adams's statements to law enforcement immediately after the incident. In her later preliminary hearing testimony, Adams provided a different account; she testified that it did not "look like [defendant] was . . . making an effort to hit [Adams]," that she did not "believe that [defendant] was trying to hurt [her]," and that she did not want defendant prosecuted. Because, as noted below, we employ substantial evidence review of subsidiary factual findings as part of our abuse of discretion review, we must defer to the trial court's resolution of the conflict between Adams's statements.

## II. Procedural Background

### A. *Initial charges*

On February 6, 2024, the People charged defendant in an information with two counts of assault with a deadly weapon, an automobile (§ 245, subd. (a)(1)). The People further alleged two aggravating factors—namely, that (1) defendant was armed with or used a weapon (namely, her car) during the offense (Cal. Rules of Court, rule 4.421(a)(2)); and (2) defendant had engaged in violent conduct that indicates a serious danger to society (*id.*, rule 4.421(b)(1)).

### B. *Mental health diversion*

#### 1. *Rapid diversion program*

On March 11, 2024, the trial court conducted a hearing on whether defendant was eligible to participate in a "rapid diversion" program due to her mental health issues. When defendant entered the courtroom, she "flipped off" her family, including Adams, who were in the gallery. After entertaining argument, the court declined to place defendant in that program and articulated two "concerns." Citing defendant's in-court conduct toward the family just as defendant was being "given the chance of possibly getting" rapid diversion, the court had "concern[s] whether, perhaps, [defendant] needs a stricter" and "more structured" "type of program" than rapid diversion offered. Citing the charged criminal conduct of "try[ing] to run over" Adams, defendant's statements that "she was going to run the victim over with her vehicle" as well as that "she didn't care who she hurts," and defendant's continued "ill feelings and flipping off the victim," the court also "ha[d] public safety concerns."

### 2.  *Mental health diversion under section 1001.36*

On August 21, 2024, defendant filed a motion for mental health diversion under section 1001.36.[4]  In support of her motion, she attached a report from Dr. Sarah Erdelyan.  Dr. Erdelyan reiterated defendant's mental health diagnoses, recounted defendant's documented history of suicide attempts as well as a 2023 incident in which defendant became combative with theater employees as well as hospital staff, and ultimately opined that, because defendant had not been "taking antipsychotic or other psychiatric medications on the date of her arrest," her mental illness had been a significant factor in the commission of the charged offenses.  Dr. Erdelyan noted that defendant had stopped taking her prescribed medications in late 2023 as well as before the charged offenses.  Dr. Erdelyan recounted that defendant did not return for a psychologist's appointment eight or nine years ago, and refused to participate in a mental health evaluation in 2022.  Dr. Erdelyan further opined that defendant would not "pose an unreasonable risk of danger to public safety" within the meaning of section 1170.18, but only "*if [she] receives outpatient mental health treatment.*"  (Italics added.)  Dr. Erdelyan further recommended that defendant "will require . . . inpatient" treatment to ensure "regular oversight of her medication compliance," and noted the potential need for "a court order for involuntary medications" if she refuses.

On September 26, 2024, the trial court held a hearing on defendant's motion.  After recounting the facts of the charged offenses (including that defendant "was driving recklessly and

---

4      Just a few days earlier, the trial court found defendant to be mentally competent to stand trial following a doctor's evaluation.

5

driving through solid red traffic lights" and then "directed her vehicle in the direction of the victim [and] the victim had to immediately swerve her car . . . to avoid a collision with the defendant"), noting that defendant's acts occurred in conjunction with her saying that "she was going to run the victim over with her vehicle" and "did not care who she hurts," and citing defendant's in-court conduct at the prior hearing on rapid diversion and how that conduct was "very disrespectful to the court," the court denied the motion, citing its "strong public safety concerns" and its determination that defendant's mental health needs and risk of recidivism would not be better addressed through mental health treatment than through the criminal justice system.

### C. *Plea deal and sentencing*

Following denial of the mental health diversion,[5] defendant entered a negotiated no contest plea to a single count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)); the People dismissed the original counts of assault with a deadly weapon; and the trial court imposed the agreed-upon low-end, two-year sentence, which amounted to "time served."

### D. *Appeal*

Defendant filed this timely appeal. The trial court granted a certificate of probable cause authorizing an appeal from its denial of mental health diversion. (§ 1237.5; see *People v. Robinson* (2024) 100 Cal.App.5th 133, 136.)

---

[5] Defendant petitioned this court for a writ of mandate to overturn the trial court's order denying diversion. We declined to grant relief, in part because the trial court had not "abuse[d its] discretion."

6

## DISCUSSION

Defendant argues that the trial court erred in denying her motion for mental health diversion.

Section 1001.36 "authorizes pretrial diversion for defendants with qualifying mental disorders." (*People v. Braden* (2023) 14 Cal.5th 791, 799.) As applicable here, a trial court tasked with deciding whether mental health diversion is appropriate under section 1001.36 must engage in a three-step analysis, first asking whether a defendant is "*eligible* for pretrial diversion," and if so, whether they are "*suitable* for pretrial diversion," and if so, whether to nevertheless exercise the court's "'residual' discretion" to deny pretrial diversion. (§ 1001.36, subds. (b) & (c), italics added; *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891-893 (*Sarmiento*); *People v. Brown* (2024) 101 Cal.App.5th 113, 121 (*Brown*).)[6] There is no dispute that defendant is *eligible* for mental health diversion because it is undisputed that she suffers from a qualifying mental health disorder and that the disorder was a significant factor in the commission of the charged offense. (§ 1001.36, subd. (b)(2).) There is also no dispute that defendant satisfies three of the four statutory *suitability* factors—namely, that (1) a qualified mental health expert has found that defendant's condition would respond to treatment; (2) defendant has consented to participate in diversion and waived her right to a speedy trial; and (3)

---

[6] The trial court must also be "satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant" (§ 1001.36, subd. (f)(1)(A)(i)), but that consideration pertains more to the ongoing treatment rather than entitlement to diversion in the first place (*Sarmiento, supra,* 98 Cal.App.5th at p. 892).

7

defendant has agreed to comply with all treatment conditions. (*Id.*, subd. (c)(1)-(3).)  The sole contested suitability factor is whether defendant poses an unreasonable risk of danger to public safety if treated in the community.[7]  (*Id.*, subd. (c)(4).)

For purposes of section 1001.36, a defendant poses an unreasonable risk of danger to public safety if there is "an unreasonable risk"—which courts have interpreted to mean a "likelihood"—"that [defendant] will commit a new violent [super strike offense]."  (§§ 1001.36, subd. (c)(4), 1170.18, subd. (c), 667, subd. (e)(2)(C)(iv); *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 690 (*Gomez*).)  The crime of attempted murder is a "super strike" offense.  (§ 667, subd. (e)(2)(C)(iv)(IV); *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1150 (*Whitmill*).)

We review the trial court's denial of a motion for mental health diversion for abuse of discretion.  (*People v. Graham* (2024) 102 Cal.App.5th 787, 795 (*Graham*).)  "'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence.'"  (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080.)  In evaluating findings for substantial evidence, we must view that evidence in the light most favorable to the trial court's ruling, including resolving any conflicts in the evidence in support of that ruling (see *People v. Mumin* (2023) 15 Cal.5th 176, 198-199); we may not "reweigh" the evidence, "'even if substantial evidence to [support a] contrary

---

[7]     At oral argument before this court, the parties acknowledged that the voluntary inpatient or outpatient programs proposed for defendant constituted treatment in the community.

[finding] also exists'" (*City of San Buenaventura v. United Water Conservation Dist.* (2022) 79 Cal.App.5th 110, 120).  The defendant has the burden of making a prima facie showing of his or her eligibility and suitability for mental health diversion (*People v. Frahs* (2020) 9 Cal.5th 618, 627), and it is defendant's burden on appeal to establish that an abuse of discretion occurred (*People v. Pacheco* (2022) 75 Cal.App.5th 207, 213 (*Pacheco*)).

The trial court did not abuse its discretion in denying mental health diversion because its factual finding that defendant was likely to commit a super strike offense is supported by substantial evidence.  Construed in the light most favorable to the trial court's ruling, the evidence at the preliminary hearing indicated that defendant drove her vehicle *at* Adams's vehicle at such speed that Adams had to "immediately swerve" out of the way to avoid the collision—and did so after running multiple red lights; the evidence also indicated that defendant, at that time, was angry at Adams and had expressed a desire to run Adams over.  Defendant's conduct, coupled with her expressed intent, can constitute attempted murder.[8]  (*People v. Young* (1987) 189 Cal.App.3d 891, 895 [deliberately driving a car into people can constitute willful, deliberate, and premeditated attempted murder, with the automobile treated as a deadly weapon].)  What is more, defendant's longstanding animosity toward Adams—expressed during the charged

---

[8]     To be sure, the trial court viewed defendant's driving as "reckless," but, as detailed above, drew a distinction between that conduct and defendant's specific conduct in "direct[ing] her vehicle in the direction of the victim" in a way that obligated "the victim . . . to immediately swerve . . . to avoid a collision."

9

offenses, during her interview with Dr. Erdelyan (where she said Adams treats her like "garbage"), and persisting into the court proceedings themselves—creates a likelihood or risk that defendant will engage in similar conduct in the future. Indeed, Dr. Erdelyan's opinion that defendant did not pose an "unreasonable risk" was qualified and conditional, applying only if defendant "*receives outpatient mental health treatment*" (italics added), yet defendant had a history of ceasing or resisting mental health treatment and halting her medications (which is no doubt why Dr. Erdelyan further recommended that "inpatient" treatment be "required" as well as recommending forced medication, if defendant did not voluntarily comply with a medication regimen). (*Pacheco*, *supra*, 75 Cal.App.5th at pp. 213-214 [qualified expert opinion that defendant did not pose a risk of a super strike as long as he remained free from drug use constituted evidence that risk exists if there is evidence that defendant might continue to use drugs]; *Graham*, *supra*, 102 Cal.App.5th at p. 801 [defendant's prior noncompliance with mental health treatment relevant evidence regarding risk of committing a super strike during diversion]; cf. *Sarmiento*, *supra*, 98 Cal.App.5th at pp. 893-894 [defendant's prior noncompliance with drug treatment is not dispositive evidence regarding risk of noncompliance with mental health treatment]; *Siam v. Superior Court* (2026) 118 Cal.App.5th 67, 84-87 (*Siam*) [defendant's prior noncompliance with prior treatments administered before a diagnosis or based on a "misdiagnosed mental disorder," particularly when there is no evidence in the record to support a finding of noncompliance, is not dispositive evidence of a risk of noncompliance for treatment based on a proper diagnosis]; *Whitmill*, *supra*, 86 Cal.App.5th at p. 1155 [unconditional expert

opinion regarding lack of risk of super strike felony relevant and dispositive of lack of risk].)

Defendant resists this conclusion with what boils down to five arguments.

First, defendant argues that she cannot be deemed unsuitable for mental health diversion due to a risk of committing a super strike offense when the People did not charge her with such an offense in this case and she has no criminal history. While the nature of the current charges and a defendant's criminal history are certainly *relevant* to the question of risk (*Gomez, supra,* 113 Cal.App.5th at p. 690), they are "not determinative" of this question (*Pacheco*, *supra*, 75 Cal.App.5th at p. 213) and for good reasons. What matters are the "circumstances of the charged offense," rather than the actual offense charged (*People v. Bunas* (2022) 79 Cal.App.5th 840, 861-862)—and here, as noted above, those circumstances show a risk of attempted murder. Further, hinging entitlement to diversion on present charges and past convictions would create a *de facto* "one free diversion" rule for anyone not charged with a super strike offense and not having a criminal history, but nothing in the text or legislative history of section 1001.36 supports such a reading.

Second, defendant asserts that the record contains evidence that she had complied with mental health treatment and a medication regimen in the past. This is true, but it is not dispositive because the record—as noted above—also contains evidence that defendant has abandoned or resisted treatment, and stopped taking medication, in the past. As noted above, we cannot reweigh this evidence to come to a different conclusion than the trial court. Nor is the trial court's weighing so

11

unreasonable as to constitute an abuse of discretion, as even Dr. Erdelyan recognized the importance of defendant remaining on medication when, in her report, she recommended that defendant may be "required" to be placed with "inpatient" treatment and, if necessary, ordered to be administered her medications.

Third, defendant urges that the People's subsequent plea deal that resulted in a time-served sentence is dispositive evidence that she did not pose an unreasonable danger to public safety. It is not dispositive. (See, e.g., *Brown*, *supra*, 101 Cal.App.5th at pp. 123-124 [existence of some evidence supporting a contrary inference of dangerousness is insufficient to overturn the trial court's determination].)

Fourth, defendant contends that several cases—and, more specifically, the decisions in *People v. Moine* (2021) 62 Cal.App.5th 440, *Whitmill*, *supra*, 86 Cal.App.5th 1138, *Gomez*, *supra*, 113 Cal.App.5th 671, and *Siam*, *supra*, 118 Cal.App.5th 67—dictate a different ruling in this case. We disagree. As a threshold matter, comparing the rulings and facts of different cases is of "limited utility" because "each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) More to the point, none of the cases defendant cites are sufficiently on point to dictate a finding of insufficient evidence of risk in this case, where the defendant acted on her threat to run down the victim by driving at the victim and getting close enough that the victim had to immediately swerve out of the way. (Cf. *Moine*, at pp. 450-451 [defendant's conduct in making verbal threats plus unqualified expert opinion that defendant did not pose risk; no unreasonable risk of super strike]; *Whitmill*, at pp. 1153-1155 [defendant's conduct in "negligently fir[ing] a single shot in the air away from those nearby" without knowing

12

anyone was nearby; no unreasonable risk of super strike]; *Gomez*, at pp. 689, 690 [defendant's conduct in shouting "get his ass, kill his ass" while co-defendant struck victim during robbery; no unreasonable risk of super strike]; *Siam, supra*, 118 Cal.App.5th at pp. 83-87 [defendant's charged conduct in stealing a yacht and then crashing it into docks, other moored boats and eventually a seawall; no unreasonable risk of super strike when trial court's findings that defendant had a history of refusing or not complying with treatment were not supported by the record].)

Fifth, defendant attacks the trial court's reasoning. Citing the general principle that a trial court abuses its discretion if it relies upon improper or irrelevant considerations (e.g., *People v. Carmony* (2004) 33 Cal.4th 367, 378 [abuse of discretion to consider "impermissible factors"]), defendant argues that the trial court's discretionary finding that she posed a danger to public safety was infected by the court's citation to an impermissible consideration—namely, to the defendant's in-court conduct toward the victim and victim's family, which the court noted was "very disrespectful" to the court.

For much the same reason that a criminal defendant's in-court "misconduct" that "abuse[s] the dignity of the courtroom" is relevant as evidence of an inability to "comply with relevant rules of procedural and substantive law" (and thus a potential basis for denying the right to self-representation) (*Faretta v. California* (1975) 422 U.S. 806, 834-835, fn. 46), defendant's in-court conduct is relevant in this case as evidence of defendant's continued animosity toward the victim and of defendant's unwillingness or inability to follow any structured rules (as would be part of a mental health treatment program). Even if we assume that the court's citation to defendant's in-court conduct as being

13

disrespectful to the court could reasonably be construed as the trial court implicitly taking umbrage at her outburst and further assume that such umbrage would be an impermissible consideration, the trial court's reference to defendant's in-court conduct is ambiguous insofar as it might refer to permissible factors or an impermissible factor. Where, as here, a trial court's finding is ambiguous, that "ambiguit[y] must be resolved in favor of upholding the action of the trial court if such can be reasonably done." (*Daly City v. Smith* (1952) 110 Cal.App.2d 524, 531; *Richter v. Walker* (1951) 36 Cal.2d 634, 639 ["Any uncertainty in the findings will be construed so as to support the judgment rather than to defeat it"]; *People v. Megladdery* (1940) 40 Cal.App.2d 748, 772 ["we must give the order, if possible, that construction that will uphold the trial court rather than indulging in another interpretation, even though equally reasonable, which would result in overruling the trial judge's discretionary powers"]), overruled on other grounds in *People v. Simon* (2001) 25 Cal.4th 1082, 1093, and *People v. Posey* (2004) 32 Cal.4th 193, 205.) To the extent defendant argues that her in-court outburst should not be viewed as evidence of her animosity or her inability to follow the rules because that outburst was instead the product of her mental illness, defendant is asking us to view the evidence differently than the trial court, which is not permissible under substantial evidence review—at least where, as here, the record does not make it unreasonable for the court to interpret defendant's in-court conduct as it did.

That the court, in stating its reasons, did not parrot the statutory language (being "an unreasonable risk of danger to public safety") and instead rested its ruling on "public safety concerns" is of no moment because the "record . . . as a whole"

14

indicates that the "court" "applied the proper concept," as it looked at the defendant's conduct and her likelihood of harming the victim again, factors pertinent to the inquiry into an "unreasonable risk of danger to public safety." (*People v. Mayfield* (1993) 5 Cal.4th 142, 196.)

*   *   *

Because we have concluded that the trial court did not abuse its discretion in concluding that defendant was not suitable for mental health diversion, we have no occasion to reach her alternative argument that the trial court erred in exercising its residual discretion to deny diversion.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, P. J.
HOFFSTADT

I concur:

_____, J.
KIM (D.)

15

The People v. Blythe Fjeld
B347828


BAKER, J., Dissenting


Defendant and appellant Blythe Fjeld (defendant) had no criminal convictions before this case and she undisputedly suffers from serious mental illness: schizoaffective disorder, bipolar type. There is no dispute that her mental illness contributed to the crimes she was charged with in this case: two counts of assault with a deadly weapon (a vehicle).[1]

The trial court, however, twice denied defendant Penal Code section 1001.36 pretrial diversion—once during a hearing where the prosecution initially stipulated defendant should get rapid diversion and again in response to defendant's later motion for pretrial diversion. In doing so, the trial court stated

---

[1] Defendant was alleged to have driven her car at her cousin while defendant was suffering from mental distress. The majority concedes the cousin testified there was never a time when defendant appeared to aim her car at the cousin or make an effort to hit the cousin. The majority, however, believes this testimony is inconsistent with a prior statement the cousin made to law enforcement: that defendant "directed her vehicle in [the cousin's] direction" and the cousin "had to immediately swerve [her] vehicle to avoid a collision." There is no inconsistency. Defendant could drive in the "direction" of the cousin and cause the cousin to swerve without aiming at the cousin or attempting to hit her. And in this criminal proceeding, it is the intent and aiming that is important. The rest is just bad driving.

defendant posed "public safety concerns"—though that seems belied by the lower term, time-served sentence the court ultimately imposed.  What is really going on in this case jumps off the pages of the transcripts of the pertinent hearings: the trial court denied diversion because it was offended defendant gave her cousin the middle finger in court.[2]

_____

[2]     At the rapid diversion hearing in March 2024, the trial court said the following at the outset:  "Now, the court was informed that, when defendant was walking out into the courtroom, she flipped off the family who is sitting in the courtroom and the victim is also present in court.  This really concerns the court because, again, this is a case where defendant is looking at four years in state prison.  She was given the chance of possibly getting [rapid diversion], and she does this act, in my courtroom, in front of me."  Taking the court's lead, the prosecution then expressed doubt about the diversion stipulation to which it previously agreed.  And after that, the trial court returned to articulating its feelings on the matter:  "Again, this is a situation where she does that act in my courtroom in front of me right before I'm about to make a decision whether or not to grant [rapid diversion].  And that just shocks me that she would do something like that."

In September 2024, at a hearing held to consider defendant's subsequently filed formal motion for pretrial diversion, the trial court returned to the offense it had taken at defendant's in-court behavior some six months earlier:  "When . . . defendant walked out into the court [in March 2024], . . . defendant flipped off the victim right in front of the court.  The court indicated that it had public safety concerns, at that point, denied [rapid diversion]; and then . . . defendant started to say 'I don't give a fuck.  I'm done.'  And she was being very disrespectful to the court."  After the defense attempted to make a record concerning why it was nonetheless error to deny diversion, the trial court *again* made reference on the record to

2

There are certainly times when engaging in offensive in-court behavior may be valid reason for a trial judge to refrain from according leniency in punishment.  Doing so here, however, is fundamentally misguided: defendant should not be denied mental health diversion for offensive in-court behavior when her mental illness undoubtedly contributed to that behavior.  Put in legal terms, I believe this case falls in the class of cases where a court abuses its discretion by relying on an improper factor in its discretionary determination.  (See, e.g., *People v. Carmony* (2004) 33 Cal.4th 367, 378 [trial court abuses its discretion when it considers impermissible factors]; *People v. Hayde* (2025) 113 Cal.App.5th 587, 597-598.)

There is no proper basis to find on this record that defendant poses a risk of committing a super strike crime.  (See generally *People v. Valencia* (2017) 3 Cal.5th 347, 351 & fn. 3.)  I would reverse with directions to redetermine the matter without adverse reliance on defendant's middle finger gesture or vaguely articulated public safety concerns that do not amount to a risk of committing a super strike.

BAKER, J.

---

defendant's months-earlier middle finger gesture and the offense it caused—while noting that the court was "always open to guidance from the higher courts.  If they feel that this court has ruled improperly, then the court would accept that."